323 Pabst Licensing v. Xilinx 323 Pabst Licensing v. Xilinx, Inc. We are all set. Please proceed. Mr. Court, the assertive claims here are directed to a technological solution to a technological problem. The assertive claims are limited to a particular way of solving that problem that's distinct from the conventional process and that is described for purposes of eligibility with sufficient specificity. And the elements of the assertive claims include inventive concepts. That's why the district court's decision should be reversed. The assertive claims here recite patent-eligible subject matter. I want to jump straight into why the claims are sufficiently specific. The district court's erroneous characterization of what the claims here are directed to is what led it to erroneously conclude that the claims lack sufficient specificity for patent eligibility. Are not all the claim limitations abstract? The claim limitations here are not abstract. Developing a set of operations and that sounds mental, passing them through a simulator and then outputting, that sounds all abstract. It's our position that the claims here are not abstract. They are directed to a particular solution that is distinct from the conventional process. And in that sense, this would fall under a big row. Okay, but can I just, at least on the first part of it, it's my understanding the district court said this is just about using a simulator instead of the actual memory device. And not withstanding words like technological and everything else, why is that incorrect? What more is there to this portion of the claim, leaving aside the packet stuff, than just using a simulator? The claims here are directed to the ability to generate what is an actually verified test rather than just a presumed good test. Okay, so that's, am I wrong? And the description of how to do it boils down to using a simulation instead of the actual memory device, right? It includes using a simulation instead of the actual memory device, but I don't think it's just using a simulator. Okay, well, tell me in the claims what's, I mean, we're not talking about the packet stuff now, we're talking about the simulation stuff. So tell me... Relating to just the claims without the packet limitation. The claims set forth that first the test operations are developed. Those test operations are then input into a simulator. The simulator is also accepts the parameter file that defines the memory device operating constraints. And it then runs the test operations against the memory device operating constraints. Yes, so you use a simulator instead of the actual memory device and then you compare it. You just sort of comparison, is that what you're saying? It does run the operations against them and compares it, and if it determines that there's a violation, then it outputs particular error messages. In other words, it tells you what the error is? Yes. Okay, so I'm having a hard time really understanding why that's not an abstract idea. Even, it's our position that it's not an abstract idea, because as in McRow, this is taking a particular solution that describes a process that's distinct from the conventional solution and tells you how to arrive at the verified test. But even if it's a close call, the elements here include inventive concepts. There's no evidence in the record that it was conventional to use a simulator in order to generate a verified test. There's no evidence in the record that it was conventional for a simulator, to the extent that that was a generic component, to be able to accept a parameter file of the operating constraints of a memory device and to compare the operating constraints of the memory device to the test operations. That is completely lacking from the record here. Xilinx makes the attorney argument that perhaps that could have been done, but there's no And as a result, the idea of actually comparing the test operations to the memory device operating constraints in order to determine whether there was a violation, that was a new and distinct process. Sounds like a 103 argument. It may be, but the issue here is that it passes the threshold patent eligibility issue. If we also turn then to the Packer claims, the Packer is identified as accepting both the parameter file that contains the memory device operating constraints, as well as a verified test that goes through the process of being run through the simulator. It then packs the operations of the test as tightly together as possible, as permitted by the operating constraints. And there's no evidence in the record that it was conventional to use, to minimize the runtime of a test by packing the operations together as closely as possible. And there's no evidence in the record that it was conventional to use that functionality in conjunction with a simulator that operated in a non-routine way. That is, that the simulator actually compared the test operations to the memory device operating constraints. Can I ask you this question? Is there anything in these claims, which as you say in your brief, are all about ending up with a very good test that depends on the idea that the subject of the test is a memory device or any other computer device, as opposed to a refrigerator or a microwave oven? You want to develop a test for stuff coming off the assembly line. And you want, therefore, a test that makes sure that when you run it on the units coming off the assembly line, correctly diagnoses whether an individual unit meets the constraints of that unit, whatever it is, a microwave oven or anything else. And so you create a simulator in which you say, these are the constraints of a good unit coming off the assembly line. And make sure that the test tests for all of that. And do it in as brief a time as possible. The claim language itself is directed to memory device. So while you could continue to back out to a level of abstraction that would take it to any test that attempts to compare thing A to thing B to see whether they match, that violates the case law's direction. That you need to look at what the claim language is and what the specification recites. And it's very clear here that what these claims are directed to, their character, as well as what the claims themselves embody, relate to the technological process of generating a test for a computer memory device. That process is computerized technology. The memory device is computer technology. The test is software. The simulator is software that operates in a non-routine way to reach an unconventional result. Sounds like if you have a new abstract idea and you put it onto a computer, that's eligible. This is not just taking, though, a pre-existing practice and sticking it on a computer and saying, use the computer as a tool to perform that activity. But even a new idea is still abstract, isn't it? It's an idea. And it's on a computer. And so how is that eligible? Well, if we're using the word invention synonymously with idea, then it doesn't mean that every invention is abstract. So here what you have is the idea of creating a verified test using a particular process that is done by software elements that do not behave in their routine fashion. And so it is not just you're taking an idea and doing it on a computer. And I think it would violate the case law to say that just because this is an improvement that occurs as a result of using software that operates in an unconventional and non-routine manner, that it is somehow abstract. That would basically mean that any software invention would be unpatentable. And that is not where the case law is, and I don't think that's where the case law should go. I wanted to touch briefly on the fact that in addition to the patents containing sufficient concepts, that here the Packer was found by the PTAB to be missing from the only prior art that's part of the record. That is, the prior art submitted by Xilinx to the PTAB in its IPR petition said that the way test writers previously attempted to runtime optimize a test was essentially by eliminating certain test operations or making them overlap so that they were not duplicative. And the PTAB found that that prior art did not recite the claimed Packer. It did not recite or disclose packing the operations together as tightly as possible, which is further evidence that here the Packer limitation and the process that employs the Packer limitation is unconventional. It wasn't previously used. The claims here more closely align with the cases that this court has found sufficiently disclose either a technological improvement that is not itself an abstract idea, such as McRow, or a technological improvement that even if can be described as an abstract idea, is sufficiently concretely described with inventive concepts to keep it from being an unpatentable abstract idea. Why don't we give them the other side. Good morning. Good morning, Your Honor. May it please the court, Matthew Solera for Xilinx. The patent claims described in past briefing and described right now by opposing counsel do not exist. Right on their own, if you look at the patents, they don't describe a detailed, specific, particular invention. Rather, the claims are directed at abstract ideas, and they lack any inventive concept that would make that patent actual. Now, at base, all that the patents claim is, one, using a simulator capable of determining whether a set of operations, a test, violates operating constraints. And then, two, using a Packer to minimize runtime of the test in relation to the operating constraints. Now, there's no disclosure at all of how the simulator does this comparison to determine whether there's a violation. Do we have an issue before us about whether the term Packer should have been construed? Well, frankly, Your Honor, PAPS did not seek construction of the term Packer. They didn't offer construction of the term Packer. At the very tail end of their brief, they said, look, if you're inclined to grant this motion, then it's pretty sure. At the end of, not their brief, at the end of the brief. In the initial plan. But they didn't offer any constructions, so I just don't think that's before the court right now. In any event, if you look at the specification, it defines a Packer just as broadly as the claim limitations do. And in fact, it defines it as a function. That's what we're dealing with here, is these broadly defined, unspecific functions. You know, I think you have to really get to the heart of the matter. What was the, was it the board, do I understand it right, that the board declined to institute an inter parties review? As to claim 14, the Packer. Right. I guess I was understanding what I heard before from Ms. Glauser to say that in the course of doing that, the board said, Packer here is different from at least the asserted prior arts, shorten the amount of time something takes prior art. Yeah, the specific prior art reference that was put forward in that. Did the board in that decision denying institution say, we interpret Packer even under a BRI standard to have the following requirements that it doesn't, that the board couldn't find in that prior art? I don't recall that it did, but even if it did, you know, that was a determination made by Judge Cote in the case before us. You have a different standard before the PTAB in the district court in the first place. There was no request for any construction of the Packer in the district court here. And even if you have a construction, what this court is focused on, in terms of inventive concept and whether it's unconventional or not, is the mechanism, right? If the essence of the invention is this packing. Right, but the mechanism, I'm not quite sure where that term comes from, but we do look at the claims, and the claims can mean A or B, depending on construction. So sometimes claim construction is necessary. Often it's not, because the range of possible claim constructions would not make any difference under the 101 standards, but sometimes it may. And as I said, they did not see the claim construction, and B, regardless of the claim construction here, I think it's still an abstract idea, and there's still no inventive concept. The mechanism language, among other places, it was in the recent Intellectual Ventures vs. Theory of Indemnity case, written by Your Honor, in which it made clear that if you simply describe something, a function, without explaining how it's actually implemented, that's not going to get you past the inventive concept step. And that's what we're dealing with here, because if you look at column 5 of the specification, to the extent that you even look at the specification, at step 2 of the analysis, all it says is that the packer is a function which calls the simulator to minimize the time between different operations. That tells you nothing about how it's done. This is really a complete black box, in which you put in a couple of inputs, right? You put in a set of operations, your test. You put in the operating constraints of the device. The specification indicates that these are both easily understood. Here's a couple of files. And then the simulator does something. It compares. Comparing is fundamentally an abstract idea. And then it determines if there's a violation, and then it lets you know if there's a violation. Whereas packing would intuitively be substantially more complicated than that. It's just not limited in the spec. It's just not limited in the spec in any way. And that's the fundamental problem here. And so even if you want to say that, sure, when there's a solution to a technological problem, that's going to be patent eligible. We just don't have a solution to find in any way in these patents, which once again is the fundamental problem. Another problem we have here, frankly, because I think we spoke this a little bit with your question about whether this is limited to memory devices. Memory device is recited in the preamble. But when you look at the claim limitations, they would apply to anything. Because any device is going to have operating constraints. And so all that recitation of memory device in the preamble does is it limits to a field of use. And it is clear in this court's case law, over and over again, they say simply limiting an abstract idea to a particular field of use is insufficient to get you past section 101. So that's what we have here with a memory device. This exact same invention, these exact same claim limitations, could apply to any device. So at base, we are left with this falling into a long line of authority, including the recent intellectual ventures cases, including player logic, which was recently decided, including the electric power group case, where you have insufficient specification, you have common familiar steps. And for those reasons, we believe that the district court correctly concluded that these are patent ineligible claims. Does the court have any further questions? Thank you. The problem with Ziding's position and the district court's argument, the district court's decision, is that it results in a cascading series of how questions. And let me put that into an illustration. In DDR, the court determined that the claims were directed to the problem of losing website visitors. It determined that although the claims were abstract, that they were nonetheless patentable because the claims described how to solve that problem. And the how there was interrupting typical internet traffic to direct a visitor to a composite web page that displayed the third-party product information from the hyperlink, as well as the look and feel elements of the host web page. And that was sufficient for patent eligibility purposes. This court did not require the patent to further describe how the composite page was generated, how the visitor was directed to the composite page, how the composite page displayed the look and feel elements. The district court, though, did that here. And that's what Ziding's is asking this court to do. See, here the claims are directed to generating an actually verified memory device test rather than a presumed good test, and generating a runtime-optimized test that is also verified. And the claims describe how to do that with sufficient particularity. It is not a black box, as Ziding's argues. The patent specifically describes that the packer packs the operations as tightly as possible given the current set of memory device operating constraints. That the packer accepts the time-ordered sequence of operations, that is, the test that's been verified by the simulator, and the parameter file, that is, the operating constraints of the memory device. And that the packer then iteratively calls the simulator to produce a version of the test that is both minimized in time, that is runtime-efficient, and that is verified. The conventional process could not do that. Likewise, the patent specifically describes that the simulator mimics the memory device, that the simulator accepts files, the parameter file and the test operations, and that it runs the test operations against the memory device operating constraints. Now, Ziding is asking for purposes of patent eligibility whether the patent further describes how it runs the test operations against the memory device operating constraints. But that's not the right question for purposes of the threshold eligibility issue. The claims are specific enough to make them a distinct process that is unconventional. What they're asking really goes more to an enablement issue. And in order to determine that, there would need to be the factual findings with what a person of skill in the art would have known based on the patent claims, the specification, and the other relevant intrinsic evidence. Finally, I wanted to briefly note that Zidings relies heavily on this court's recent cases in Ivey v. Erie and Ivey v. Capital One. But those cases cannot be analogized here. Both of those cases dealt with analyzing or manipulating data. That is an area that this court has repeatedly said is an abstract concept. In addition, both of those cases failed the Step 2 of ALICE because they did not provide any description of how to, for instance, edit the XML documents in a way that allowed them to be format compatible or how to use the index to locate documents from a database with anything except generic conventional components. That is not this case. Likewise, in Clear Logic, the claims were cited using an algorithm engine. But it didn't include any identification or explanation of what that algorithm engine was, and in fact said that the algorithm engine could be anything supplied by a third party that established what rules might apply for purposes of certifying a borrower's financial records. For all those reasons, we would ask that the district court decision be reversed. Thank you. We thank both sides for cases submitted. That concludes our proceedings for this morning.